UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ZECARY L. BANKS,                                **DECISION AND ORDER**

               Petitioner,                      6:21-CV-06586 EAW

    v.

DANITA MACINTOSH,

              Respondent.

_____

## I.    <u>INTRODUCTION</u>

*Pro se* petitioner Zecary L. Banks ("Petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges the constitutionality of the judgment entered against him on September 8, 2017, in New York State, Chemung County Court (Rich, Jr., J.), following a jury verdict convicting him of second-degree attempted murder (New York Penal Law ("P.L.") §§ 110.00/125.25(1)), three counts of first-degree assault (P.L. § 120.10(1)), two counts of second-degree assault (P.L. § 120.05(2)), and two counts of second-degree criminal possession of a weapon (P.L. § 265.03(1) (one count) and P.L. § 265.03(3) (one count)).  (Dkt. 1 at 1).[1]  Petitioner is serving his sentence on this

---

[1]    Page citations to Petitioner's and Respondent's pleadings are to the pagination automatically generated by the Court's case management and electronic filing system (CM/ECF) and located in the header of each page.

judgment.[2]  For the reasons below, Petitioner's request for a writ of habeas corpus is denied and the petition is dismissed.

## II.   <u>BACKGROUND</u>

### A.   Indictment

Petitioner's conviction arises from a shooting that occurred at about 12:45 a.m. on July 28, 2016, at Patrick's Bar ("Patrick's") on College Avenue in Elmira, New York.  On August 11, 2016, a Chemung County grand jury returned a nine-count indictment against Petitioner charging him in connection with the shooting as follows:  one count of second-degree attempted murder (P.L. §§ 110.00/125.25(1)) as to Anthony Mack ("Mack"); one count of first-degree criminal use of a firearm (P.L. § 265.09); three counts of first-degree assault (P.L. § 120.10(1)) as to Mack, Kevyn Walker ("Walker") and Nicolas Ewanyk ("Ewanyk"); two counts of second-degree assault (P.L. § 120.05(2)) as to Cody Whitmer ("Whitmer") and Jesus Rivera ("Rivera"); and two counts of second-degree criminal possession of a weapon (P.L. § 265.03(1) (one count) and P.L. § 265.03(3) (one count)). (Dkt. 23-2 at 70-74).

### B.   Trial

Petitioner's jury trial before Chemung County Court Judge Richard Rich, Jr. ("trial court") commenced on July 11, 2017.

---

[2]     *See* https://nysdoccslookup.doccs.ny.gov/ (results for DIN 17A3768 (last accessed September 9, 2024)).

1.      **Prosecution's Case**

    a.      **Three Witnesses Identify Petitioner as the Shooter**

       i.      **Casey Wood**

Casey Wood ("Wood") testified that she met her friends Melissa Payne ("Payne") and Samantha Richer ("Richer") at Patrick's at around 11 p.m. on July 27, 2016.  (T: 525).[3] She had one shot of tequila and then watched her friends perform karaoke.  (T: 525-26). She described her location in the bar as "to the left [as you walk in] by the booth, kind of by the windows."  (T: 526-28).  At some point, she heard a loud noise that "sounded like fireworks that light off and there's a whole bunch next to each other," like "[b]oom, boom, boom, boom."  (T: 528-29).  She saw a "dark-figured man to [her] right" "by the front doors" "[m]aybe six feet away."  (T: 528, 529).  She saw him "raise his arm" and "saw a motion of something happen," but she "didn't see the actual gun."  (T: 529, 530, 546).  She knew the dark-figured man as Payne's daughter's father's best  friend.  (T: 529-30).  She said "[t]hey call him Ceez, but from [her] understanding it's Zecary."  (T: 530).  She had "no doubt" the dark-figured man was "Ceez."  (T: 531).  She identified Petitioner in court. (T: 534).

On cross-examination, defense counsel elicited that Wood had told a police officer at the scene that she was "93 percent" sure Petitioner was the shooter, and that the "7 percent" doubt was because she did not see a gun.  (T: 547-48).

---

[3]      Citations in parentheses to "T:" refer to the original page numbers of the trial transcript, which begins on page 175 of Docket 23-8 and concludes on page 29 of Docket 23-13.

### ii.   Payne

Payne's daughter's father is Marcus Shazer ("Shazer"), who was friends with Petitioner; Payne had known Petitioner for about six years.  (T: 1028-29).  Payne identified Petitioner in court.  (T: 1029-30).

On July 27, 2016, Payne arrived at Patrick's at about 11:30 p.m.  (T: 1030-31).  She went out to the patio in the back and encountered Petitioner.  (T: 1036-37).  They had a five-minute conversation about how they had been and about Shazer.  (T: 1037-38).  Payne asked Petitioner if he was "going back and telling [Shazer] stuff" about when Petitioner sees Payne out with friends.  (T: 1038).  Petitioner was not "animated, angry, heated or anything" and "was having a good time at the bar."  (T: 1039).  Petitioner was wearing a red, fitted baseball cap, and a black shirt.  (T: 1038-39).

After that conversation, Payne reentered the bar and walked to an area near the front.  (T: 1040-43).  She was talking to some friends when she "heard something loud go off, kind of sounded like fireworks or something like that."  (T: 1045).  Payne "turned around and there was [Petitioner] shooting a gun pointed towards the bar."  (*Id.*).  Petitioner was "probably like a few feet away from [her]."  (T: 1046-47).  Payne could not see what type of gun Petitioner had, but she saw a flash coming from the hand holding the gun.  (T: 1053).  Payne had no doubt in her mind that Petitioner was the shooter.  (T: 1047-48).  After the shooting stopped, Payne got up off the floor and started talking to Rivera, who had been shot in the arm.  (T: 1049-50).  Payne then left the bar and walked over to the parking lot across the street.  (T: 1050).

On cross-examination, Payne clarified that she did not see a gun; she heard the "pop, pop, pop" sound and saw a flash, "so [she] figured it was a gun."  (T: 1068; *see also* T: 1076 ("I knew I saw him holding something and flashes.")).  Payne admitted that when she spoke to the police on the night of the shooting, she initially stated only that Petitioner was "in the area" and she "c[ould]n't say it was him."  (T: 1070; *see also* T: 1075).  Payne then told the police she was "75 percent sure" the shooter was Petitioner.  (T: 1068-69).  Eventually, she positively identified Petitioner as the shooter.  (T: 1075).

Payne denied that the police pressured her into naming Petitioner as the shooter.  (T: 1076).  She admitted that she "knew the whole time" it was Petitioner (T: 1076) but, as she told the police "a few times," she did not want to be involved because of her daughter and the fact that Petitioner was friends with Shazer.  (T: 1080-81).  She told the police she was concerned about retaliation from Petitioner and members of his family, as well as from Shazer due to his friendship with Petitioner.  (T: 1082-83).  Payne said she did not and does not harbor any ill will toward Petitioner.  (T: 1083).

### iii.    Perris Dowdle

Perris Dowdle ("Dowdle") was working as a doorman at Patrick's on July 27, 2016.  (T: 804-05).  At 12:45 a.m., Dowdle was inside the bar, near the entrance to the room where the shooting occurred.  (T: 807-08).  Three black males, one of whom Dowdle had seen before, walked towards him from the right side of the bar.  (T: 811-12).  After Dowdle checked the men's IDs, they "were just kind of standing there."  (T: 813-14).  As Dowdle turned around to continue the conversation he had been having, he heard a gunshot from the area where the three men were standing.  (T: 814).  As two more gunshots rang out,

Dowdle saw a flash come from Petitioner's outstretched hand, but he did not see a gun. (T: 814-15).  Petitioner was wearing dark clothes and a red hat.  (T: 836).  While Dowdle was running out of the bar, he heard three more shots.  (T: 815).  Dowdle identified Petitioner in court.  (T: 815-16).  Dowdle explained that he initially told the police he did not want to be involved because he was in a band that performed locally and did not want to risk any retaliation.  (T: 837).

### b.   Five Witnesses Identify Petitioner's Clothing

### i.   Collin McLaughlin

Collin McLaughlin ("McLaughlin") was working as a bartender at Patrick's on July 27, 2016.  (T: 1245-46).  McLaughlin testified that he served a man named "Zecary" whose last name he did not know but whom he had seen in the bar previously.  (T: 1263-64, 1266-67, 1271-73).  On the night of the shooting, the man McLaughlin knew as Zecary was wearing a dark t-shirt and a red, fitted, flat-brimmed baseball cap.  (T: 1273, 1275-77).

At some point, McLaughlin heard gunshots coming from the front door and going towards the back of the bar; he also saw a muzzle flash.  (T: 1257-58, 1268-69).  He heard two firecracker-like "pops" initially and about five or six "pops" in total.  (T: 1256-58, 1259, 1262-63).  After the first two gun shots, McLaughlin dropped to the floor behind the bar, so he did not see the shooter.  (T: 1256, 1258).  McLaughlin did not know where "Zecary" was at the time of the shooting and did not see him with a gun.  (T: 1267).

### ii.    Courtney Edger

Courtney Edger ("Edger") arrived at Patrick's with two of her friends at about 10:30 p.m. on July 27, 2016.  (T: 1087-88).  She initially went to the back of the bar but eventually made her way to the front area near the karaoke machine.  (T: 1090-91).  At some point, while she was standing with her back facing the front door, she heard one gunshot from behind her; she turned around and saw a gun pointed towards the bar area.  (T: 1094-96).  She was about five to ten feet away from the shooter, who was wearing a black t-shirt and a baseball hat in a color she could not recall.  (T: 1096-97).  She did not recognize the person with the gun.  (T: 1097, 1098).  Behind the shooter was a black man with a skinny face and short dreadlocks.  (T: 1097).  However, she did not see more than one gun and did not hear gunshots coming from different directions.  (T: 1112-13).  She saw a flash from a silver gun barrel and heard five shots, after which the shooter ran out the front door.  (T: 1098).  She did not know Petitioner personally but had seen him at Champs Sports, where she worked as an assistant manager.  (T: 1086, 1097-98).

### iii.    Michael Colunio

Michael Colunio ("Colunio") arrived at Patrick's Bar around midnight with Walker, his cousin.  (T: 488-89).  At about 12:45 a.m., Colunio was standing next to Walker in front of the bar with his back to the front door area.  (T: 492-93, 495).  Colunio heard two gunshots that sounded as though they were coming from the front door area.  (T: 494, 495).  Colunio looked over his left shoulder and saw "a guy shooting a gun" who "was aiming at a guy running through the bar" towards the back door.  (T: 494, 501).

Colunio said the shooter was a black male with a red hat and a black shirt, and he was standing about five feet in front of the front door.  (T: 495-96).  The shooter was shooting at a black male about seven feet in front of him who did not have a gun or shoot back.  (T: 496, 506).  Colunio heard five or six shots in total but only saw the man with the red hat and black shirt fire two or three shots.  (T: 501).  Colunio did not know Petitioner or Mack, and he would not be able to identify the shooter.  (T: 502).

### iv.    Shawn Drum

Shawn Drum ("Drum") arrived at Patrick's around midnight.  (T: 667).  He saw his friends, Colunio and Walker, towards the end of the bar near the front entrance and talked to them for about 15 or 20 minutes.  (T: 667-68).  He then went outside to smoke a cigarette.  (T: 668).

When he came back into the bar, he stood near the left side of the front entrance where he chatted with Richer.  (T: 668-69, 670-71).  Drum heard the "first couple shots," which sounded like "a little pop pop" and made him turn his head.  (T: 668, 671, 674).  He saw a man with his "arm outstretched," holding a gun with his right hand; he then saw a couple of flashes and heard three to four more shots.  (T: 674-75, 680).  The shots came from the front entrance, to Drum's right.  (T: 674).  The shooter was a black male, dressed in a dark blue or black shirt, wearing some type of red baseball hat.  (T: 676, 699-700).  Drum did not recognize the shooter.  (T: 677).  He did not see a second gun or a second shooter.  (T: 679).  The shooter's arm was moving but Drum could not see the intended target.  (T: 675).

Drum said the gun looked like a revolver, as it did not have the slide mechanism on the top like the guns that police officers carry.  (T: 679, 699-700).  It was a smaller weapon, but Drum could not recall the color.  (T: 679-80).  The lights were somewhat dimmed inside the bar, but it was not dark.  (T: 684-86).  There was enough light that Drum had no doubt about the type and color of clothing the shooter was wearing or the appearance of the weapon in the shooter's hand.  (T: 685-86).  As Drum ducked to avoid being hit, he heard someone yell that Walker had been shot.  (T: 677).  After the shooter stopped shooting, Drum ran out the front door.  (T: 678, 680).

### v.    Matthew Gilboy

Matthew Gilboy ("Gilboy") arrived at Patrick's around midnight with Whitmer. (T: 703).  For most of the night, Gilboy and his friends were standing near the middle of the establishment, facing the bar area.  (T: 705-06).  At around 12:40 a.m. or 12:45 a.m., Whitmer was standing directly in front of Gilboy, buying a drink at the bar.  (T: 707). Gilboy heard "about five shots" "started coming into the bar."  (*Id.*).  Gilboy "saw the first shot go off out of the corner of [his] eye, like a flash."  (T: 708).  He looked to his left and saw "a black male about 5' 8" . . . [or] 6[-]foot[,] shooting . . . ."  (*Id.*).  Gilboy saw two more flashes.  (*Id.*).  Although Gilboy could not say "what exact gun it was, . . . [he] knew it was a gun."  (T: 709).  Gilboy thought the shooter was wearing a black hoodie.  (T: 708).

After he saw the additional two flashes, Gilboy turned and started running towards the back of the bar; he hid behind a wall by the dart board until the shooting stopped. (T: 709-10).  He left through the back entrance and eventually met up with Whitmer, who

had been shot.  (T: 711).  While one of their friends brought Whitmer to the hospital, Gilboy picked up Whitmer's parents and took them to the hospital.  (*Id.*).

### c.   Four Witnesses Testify Regarding Petitioner's Location in the Bar and the Location of the Gunshots

#### i.   Walker

Walker arrived at Patrick's at around midnight with Colunio.  (T: 619-20).  At about 12:45 a.m., Walker was standing near the bar, facing away from the front door area, when he heard gunshots.  (T: 620-21, 624-25, 648-49).  He looked over his left shoulder toward the front of the building and saw a flash that appeared to come right towards him and the people standing at the bar.  (T: 624-25, 641-42, 651-53).  Walker was certain that the gunshots were coming from the front door area.  (T: 624-25, 659).  Walker estimated that he heard four to five gunshots—two shots, a brief pause, and two more shots.  (T: 626, 651-52).  He then felt a burning sensation and wetness in his left buttocks.  (T: 627).  He left the bar through the front door and a police officer brought him to St. Joseph's hospital; he then was brought by ambulance to Robert Packer Hospital where he underwent abdominal surgery and a colostomy.  (T: 629-30, 635-36).  Walker did not know Petitioner or Mack.  (T: 642).

#### ii.   Ewanyk

Ewanyk arrived at Patrick's around 12 a.m. or 12:15 a.m.  (T: 556).  He was standing at the bar and had just turned to his right to talk to someone when he heard gunfire and "hit the floor."  (T: 556-58).  He heard "one or two" gunshots in a row and "then a little bit of a pause and then the other ones."  (T: 560).  The shooting was coming from over his left

shoulder, i.e., from the front door area of the bar.  (T: 579).  He did not see anyone shooting

gun.  (*Id.*).  Ewanyk said that he did not know Petitioner or Mack.  (T: 578).

Once the "chaos had died down some," Ewanyk realized that he had been shot in

his left side.  (T: 558-59).  He sat down and leaned against the bar, and someone held a

towel against the wound while they waited for the EMTs to arrive.  (T: 559, 562).  At

Ewanyk's request, he was taken to Robert Packer Hospital just over the state line in

Pennsylvania.  (T: 562).  He did not remember much of anything after that, except he

agreed to receive a blood transfusion at the hospital.  (T: 563).  The next day, he learned

he had undergone surgery to repair his colon and small intestine.  (T: 564).  After a four-

day stay, he was discharged from the hospital.  (T: 564-65).  He still has a bullet lodged

behind his liver, a scar that runs up the front of his stomach, and a small scar from the bullet

entry.  (*Id.*).  He could not lift more than eight pounds until September 2016, when he was

cleared to return to work as a laborer and heavy machine operator.  (T: 566-67).  He

continued to have pain for several months thereafter.  (T: 567).

### iii.    Whitmer

Whitmer arrived at Patrick's at around midnight with Gilboy.  (T: 390).  About five

minutes after he arrived, Whitmer saw Mack at the bar and said hello to him.  (T: 392, 405-

06).  Whitmer knew Mack from when he had worked at the 7-Eleven in Elmira, where

Mack was a frequent customer.  (T: 392).  Whitmer had never seen Mack at Patrick's

before, and he did not know Petitioner.  (T: 406).

Around closing time, Whitmer bought a beer for himself and a friend.  (T: 410).  He

was standing near the middle of the bar with his back to the front door area.  (T: 410-11).

Just as he was handing the drink to his friend, he "heard a loud sound" but he did not know what it was or where it was coming from.  (T: 412).  At first, Whitmer did not move.  (*Id.*).  Then he heard more of the same noise, which sounded like gunshots, and he started to run.  (T: 412-13).  He still had no idea where the sound was coming from.  (*Id.*).  As he was running toward the front door, there were "still more shots . . . being fired" which sounded like "loud bangs," but he could not tell where they were coming from.  (T: 413).

Once outside, Whitmer realized that he was bleeding from his right forearm and right abdominal area.  (T: 416, 418-19).  Whitmer did not know who shot him, and he did not know Petitioner.  (T: 434).  Whitmer approached a police officer who told him to wait, so he laid down on the ground.  (T: 421).  His friend, Marcus Barclay, picked him up and brought him to Arnot Medical Center.  (*Id.*).  At the hospital, Whitmer's wounds were bandaged and he was given intravenous medication; he was discharged after two days.  (T: 423-24).  He spent one month recovering and could not work.  (T: 424-25).  He displayed the scars from his arm and abdominal wounds for the jury.  (T: 425-27).

### iv.    Robert Brinks

About "three to four minutes" before the shooting, Robert Brinks ("Brinks"), a hospital medical assistant, arrived at Patrick's Bar with a friend.  (T: 843-44).  They had just purchased drinks and were standing by the dart board in the back of the bar when Brinks heard "three pops" coming from the front of the bar.  (T: 844, 845-46).  Brinks put down his drink and walked towards the front of the bar to see if there was anything he could do to help.  (T: 846-47).  As he moved toward the front, Brinks heard two more shots.  (T: 847).  Brinks did not see the shooter.  (T: 848).

Near the front of the bar, Brinks saw a man lying on the floor with wound on his side; Brinks briefly examined him.  (T: 847-48).   By that point, the bar was empty.  (T: 848).  Brinks' friend, a physician assistant, began helping the wounded man, so Brinks went outside to see if there was anybody who needed help.  (*Id.*).  Brinks spoke to a man holding his face and leaning against a vehicle.  (T: 849).  Brinks described this person as a black male, about 5′6″ and in his mid-30s.  (T: 850).  The man said he had been shot a couple of times and was waiting for his girlfriend to pick him up.  (T: 849-50).  Brinks did not know the man.  (T: 850).  A car pulled up, and the man walked towards the vehicle and got into it.  (T: 849-50).  Brinks informed the police about this encounter.  (T: 851).

### d.    The Medical Treatment Provided to the Victims

### i.    Mack and Whitmer

Dr. Georgios Hatzoudis treated Whitmer and Mack at the Arnot Medical Center.  A CT scan revealed that Whitmer sustained a through-and-through, insignificant gunshot wound to his right arm as well as a tangential gunshot wound to his abdomen, i.e., the bullet did not enter the abdominal cavity.   (T: 454-55, 458).  Dr. Hatzoudis could not determine whether one or more bullets caused the wounds.  (T: 455, 459-61).   Surgery was not required, but Dr. Hatzoudis kept Whitmer overnight for observation.  (T: 459-60).

Mack collapsed shortly after entering the emergency room because he had virtually no blood pressure.  (T: 462, 465).  After he was resuscitated, intubated, and given fluids and blood, he underwent a CT scan showing an accumulation of gas in his chest.  (T: 464-66).  Dr. Hatzoudis inserted a chest tube and prepped Mack for a laparotomy.  (T: 467).  Upon opening Mack's abdomen, Dr. Hatzoudis saw a liter or more of free blood; he then

determined that most of the bleeding was coming from "an explosive injury" in the upper abdomen. (T: 467-68). In particular, there was one hole in Mack's stomach, two holes in his duodenum, and two holes in his colon which Dr. Hatzoudis had to close to prevent contamination. (T: 468-69). Mack also had two holes in his left upper chest near the armpit, one hole in his left arm, one hole in his right flank, and a through-and-through injury to his small bowel which had to be resected. (T: 469, 470). Dr. Hatzoudis observed a lot of blunt injury to Mack's face, but it did not look like a penetrating wound on the CT scan; the facial injuries did not require immediate attention because there was no brain involvement. (T: 472-74). In addition, the only treatment for those injuries was oral-maxillofacial surgery, which Dr. Hatzoudis could not provide. (T: 474-75).

Dr. Hatzoudis performed abdominal surgery on Mack for about two or three hours but had to end the surgery prematurely due to Mack's hemodynamic instability. (T: 469). Mack was airlifted to the trauma center at Strong Memorial Hospital. (T: 469-70, 475). Dr. Hatzoudis said that given the number of injuries and their seriousness, Mack was "lucky to be alive." (T: 476). Had Mack not received the medical care provided by Dr. Hatzoudis and his team, Mack would not have "lasted for more than a few minutes." (T: 469).

Dr. Hatzoudis recovered one bullet from Mack's body and turned it over to the police. (T: 471). He could not determine the exact trajectory of the bullet or bullets or if multiple wounds could have resulted from a single bullet. (T: 475). This information would not have affected the course of Mack's treatment, so Dr. Hatzoudis was not concerned about it. (T: 479, 481).

###### ii.    Ewanyk and Walker

Dr. Robert Behm treated Ewanyk and Walker at Robert Packer Hospital.  (T: 593, 602).  Though Ewanyk was stable, he had a gunshot wound to his left abdomen; a CT scan showed that just below his kidney, there was a retained ballistic missile which had perforated the bowel.  (T: 594-95).  Ewanyk required an immediate exploratory laparotomy as well as a bowel resection.  (T: 594, 597-98).  Dr. Behm did not try to remove the bullet because digging around Ewanyk's tissues trying to find it would have done more harm than good.  (T: 598).  Had Ewanyk not received the surgery, he "would have died" of abdominal sepsis from his bleeding bowel.  (T: 599-601).

Dr. Behm then treated Walker, who was stable but had a single gunshot wound to his left buttock and was bleeding from his rectum.  (T: 602-04).  A CT scan showed a retained ballistic fragment in the right leg; the bullet passed through the left buttock, hit the rectum, and became lodged in the leg.  (T: 604).  Dr. Behm determined that Walker sustained an injury to the front part of the rectum which was not amenable to repair due to its size.  (T: 605-06).  Accordingly, Dr. Behm performed a loop colostomy to allow the wound to heal.  (T: 606-07).  The colostomy was reversed after several months.  (T: 609-10).  Without the treatment he received, Ewanyk "would have died" from pelvic sepsis due to stool leaking into his body.  (T: 610-11).

### iii.    Rivera

Dr. Mark Gibson evaluated Rivera in the early morning of July 28, 2016, for his complaints of a gunshot wound to his left arm.  (T: 770-71).  Dr. Gibson determined there was a projectile lodged in Rivera's left arm near the elbow.  (T: 772).  An x-ray showed no structural damages to the bone or nerves.  (T: 773).  Dr. Gibson removed the projectile and turned it over to the police.  (T: 774-75).  After Rivera's wound was sterilized and bandaged, he was discharged.  (T: 774).

### e.    The Recovery of a Firearm from a Nearby Rooftop

Michael Trahan ("Trahan") testified that during the summer of 2016, he worked as a manager at the Doller General located a block north of Patrick's Bar.  (T: 943-47).  In early August, a customer informed him that there was an object that appeared to be a gun on the garage across the street from the store.  (T: 947).  Trahan went outside and confirmed that there was a gun on the top of the garage roof.  (T: 948-49).  Trahan, who had military experience and was familiar with guns, said that based on the damage to the roof and the way the gun was lying, it appeared to have been thrown onto the pitched roof and to have slid down a couple of feet.  (T: 950-51).  Trahan called the police.  (T: 953).

Elmira Police Department Officer Isaac Marmor ("Marmor"), accompanied by Officer Stephen Lincoln ("Lincoln") responded to Trahan's call.  (T: 961).  Marmor spoke to Trahan and observed a gun on the garage roof.  (T: 962).  Marmor, wearing gloves, climbed up to the garage roof and retrieved the gun—a Smith & Wesson Model 36, a .38 Special caliber weapon.  (T: 963-94, 974).  Lincoln brushed the firearm for fingerprints and swabbed it for DNA evidence.  (T: 977).  Lincoln said there were five spent .38 Special

shell casings inside the gun, which appeared to have some rust on it.  (T: 974).  He then packaged the gun and swabs to be sent to the New York State Police Laboratory for examination.  (T: 976-77, 979).

Shelby Clark ("Clark"), a meteorologist at WETM, an Elmira television station, testified that he reviewed weather records for the period between July 28, 2016, and August 4, 2016.  (T: 988-89, 990-93).  The records showed that based on the rain gauge data at the Elmira-Corning Regional Airport, more than one-half inch of rain fell on July 30, 2016; and more than two inches of rain fell on August 1, 2016.  (T: 993-94).  On July 28 and 30, 2016, the high temperature was 92 degrees Fahrenheit.  (T: 996).

Cheryl Stevrell ("Stevrell"), a forensic scientist at the New York State Police Forensic Investigation Center, testified that typically, no DNA profiles are recovered from weapons because the shooter wore gloves or wiped off the gun, or the DNA was washed away by rain or degraded by heat.  (T: 1137).  In general, no DNA profiles are recovered from casings because there is minimal physical contact with them, and the heat produced by firing degrades the DNA.  (T: 1139-40).

Stevrell tested the swabs obtained from various surfaces on the recovered revolver (barrel, handle, trigger, hammer, frame, and cylinder) but there was no DNA evidence present.  (T: 1137, 1141).  Given that the revolver was found on a rooftop, appeared to have rust on it, and was exposed to temperatures as high as 92 degrees Fahrenheit, Stevrell was not surprised that there was no DNA profile on any of the surfaces.  (T: 1139).

Maria Rauche ("Rauche"), a firearms examiner with the New York State Police Forensic Investigation Center, determined that the Smith & Wesson Model 36 revolver

recovered from the rooftop was operable by test-firing it into a tank of water using laboratory stock ammunition. (T: 1142-43, 1150-51, 1154-55). A Smith & Wesson Model 36 is a .38 caliber revolver having five chambers capable of holding five cartridges. (T: 1151-53). After comparing the two bullets she had test-fired with the four bullets recovered during the investigation, Rauche determined that they had matching class characteristics, i.e., the same lands and grooves, right-hand twist, caliber, and type of rifling. (T: 1170-71, 1172). However, she observed no individual characteristics and thus did not have enough information to conclude whether the recovered bullets came from the recovered revolver. (T: 1172, 1184).

### f.     Petitioner Flees to North Carolina

Danielle K. Hochberg ("Hochberg") testified that she owns 808 Lincoln Street in Elmira, which has an upper and lower apartment. (T: 1208-09). Petitioner was her tenant for about three months in 2016. (T: 1209). He had a dog. (T: 1210). As of July 28, 2016, Petitioner was current on his rent payments. (*Id.*).

At about 8 a.m. on July 28, 2016, Petitioner's ex-girlfriend, Emily Oparil ("Oparil"), called Hochberg. (T: 1211). Following their conversation, Oparil came over to 808 Lincoln Street and retrieved Petitioner's dog and some of his belongings. (*Id.*). Petitioner did not pay the rent due on the first of August, and Hochberg never saw him again. (T: 1212-13). With Oparil's permission, Hochberg took the rest of Petitioner's items in the apartment, e.g., a couch, a bed, a rug, and a microwave. (T: 1213-15).

Investigator Robert Gunn ("Gunn") of the Elmira Police Department went to look for Petitioner at 808 Lincoln Street on July 28, 2016, at about 11 a.m. (T: 1223-25).

Petitioner was not there. (*Id.*). Gunn then went to Oparil's house; she told Gunn that Hochberg had contacted her that morning to pick up Petitioner's dog and personal belongings. (T: 1225-26). Oparil told Gunn she had not had any contact with Petitioner and did not know his whereabouts. (T: 1226). Similarly, Petitioner's family members told Gunn they did not know where he was or how to contact him. (T: 1227). On September 9, 2016, members of the United States Marshals Service located Petitioner in Charlotte, North Carolina and returned him to New York State. (T: 1228).

David Brown ("Brown"), a New York State licensed bail bond agent,[4] issued a bail bond for Petitioner in an unrelated case on June 1, 2016. (T: 1233-34). As a bond condition, Petitioner had to check in with Brown by phone every Monday. (T: 1235). Petitioner did so regularly until sometime in August; Brown recalled that it was after Petitioner was accused of the shooting. (T: 1235-36).[5]

### 2.     The Defense Case

The defense called Cyril Ellis ("Ellis"), who testified that he was familiar with Petitioner since they both grew up in Elmira. They would converse if they happened to

---

[4]     The trial court provided limiting instructions to the jury that any evidence that Petitioner was accused of an unrelated crime was not evidence that he committed the crimes at issue in the trial. (T: 1227, 1232).

[5]     After the prosecution's case, during a preliminary charge conference, trial counsel requested a missing witness charge with regard to Rivera, Mack, and possibly Mack's girlfriend. (T: 1304). The prosecution argued that it did not have exclusive control over these individuals, noting that the defense could seek a material witness order. (T: 1305). In addition, Rivera's whereabouts were unknown, and Mack definitely had refused to cooperate with the prosecution. (*Id.*). The trial court declined the request for a missing witness charge, finding that the individuals were not "under the control of the People." (T: 1306).

run into each other, but they had "[n]o real personal relationship. . . ."  (T: 1316).  On the night of July 27, 2016, Ellis was at Patrick's; Petitioner was near the back of the bar and was the first person Ellis greeted when he arrived.  (T: 1317-18).  They talked for five or ten minutes, and then they saw "some people come in the bar and [Petitioner] got a little disturbed."  (T: 1320).

At some point, Ellis turned back to his companions.  (T: 1321).  Then he noticed Petitioner speaking with another man, whom he later identified as Mack.  (T: 1321, 1332, 1337).  Ellis said that the conversation was "getting a little heated" with "[a] lot of emotions, hand language."  (T: 1321-22).  Ellis "paid attention closely" to Petitioner and Mack because he was "aware of something that had happened to [Petitioner] previously" that he "didn't want . . . to happen" again to him.  (T: 1322).

Ellis said that Mack put his arm around Petitioner's shoulder or neck and was "trying to swing him around" towards the front of the building.  (T: 1324-26, 1339).  Ellis started walking towards them and heard shots being fired from more than one gun.  (T: 1325-26, 1360).  Petitioner did not have a gun in his hand, and Ellis did not see Petitioner shoot anyone that night.  (T: 1327).  Ellis heard about seven or eight shots coming from the front entrance.  (T: 1327-28).  Ellis headed towards the back of the bar to exit through the patio area.  (T: 1328).

Ellis said that when he saw Mack put his arm around Petitioner, it looked as though Petitioner was struggling and trying to "get away from that dude."  (T: 1341-42).  Then "gunshots and everything" happened.  (T: 1342).  When asked where Petitioner and Mack were at that point, Ellis replied: "Gone."  (T: 1351).

Ellis admitted that he knew Mack by the name "Silk," that Mack was from Rochester, and that Mack and Petitioner "had a problem" with each other.  (T: 1332-33, 1337).  Ellis claimed he did not know the specific nature of the problem; he just knew that they "had an interaction."  (T: 1333).  Ellis then admitted telling an investigator for the prosecutor's office that he had heard about an incident in which Mack had stripped and robbed Petitioner.  (*Id.*).

Ellis was asked several times if he saw the person who shot the gun; he repeatedly stated, "It was not Zecary Banks."  (T: 1362).  The trial court asked Ellis the name of the person that fired the gun; Ellis replied, "I don't know."  (*Id.*).  Ellis admitted he saw a person fire a gun; however, he unsuccessfully attempted to "plead the Fifth" to avoid answering the question of where that person was located.  (*Id.*).  Ellis then said that one of the two shooters was Mack, and he fired at Petitioner.  (T: 1363-64).  Of the seven or eight shots Ellis heard, he was not sure how many were directed at Petitioner.  (*Id.*).  Ellis did not know the name of the other shooter but had seen him at the bar earlier and that he was one of Mack's friends.  (T: 1363, 1364-65).

### C.    Verdict and Sentence

Prior to jury deliberations, the prosecution withdrew count two charging first-degree criminal use of a firearm.  (T: 1301-02).  The remaining eight counts were submitted to the jury, which returned a guilty verdict on all of them.  (T: 1516-17).

Sentencing was held on September 8, 2017.  The trial court imposed a 25-year determinate term of imprisonment plus five years' post-release supervision on the convictions for counts one and three (attempted murder and first-degree assault,

respectively) involving Mack.  (S: 14).[6]  On counts four and five, charging second-degree criminal possession of weapon and involving Mack, the trial court imposed determinate sentences of 15 years plus three years' post-release supervision.  (*Id.*).  All four sentences were set to run concurrently.  (S: 14-15).

On counts six and seven, charging first-degree assault and involving Ewanyk and Walker, respectively, the trial court imposed 25-year determinate terms of imprisonment plus five years' post-release supervision.  (S: 15).  On counts eight and nine, charging second-degree assault and involving Whitmer and Rivera, respectively, the trial court imposed determinate sentences of seven years plus five years' post-release supervision.  (S: 15-16).  Each of the sentences related to the convictions on counts six, seven, eight, and nine were set to run consecutively to each other and consecutively to the sentences on counts one, three, four, and five.  (*Id.*).

### D.    Direct Appeal

Represented by new counsel, Petitioner appealed his conviction to the Appellate Division, Third Department, of New York State Supreme Court ("Appellate Division"). Petitioner argued that: (1) the evidence was legally insufficient to support the convictions, and the verdicts were against the weight of the evidence; (2) the trial court's denial of a missing witness charge as to Mack and Rivera was reversible error; (3)(a) the trial court erroneously admitted testimony from certain witnesses that they were reluctant to testify because they feared retaliation, and (b) defense counsel was ineffective for failing to object

---

[6]     Citations in parentheses to "S:" refer to the original page numbers of the sentencing transcript, which begins on page 30 of Docket 23-13.

to such testimony; (4) the trial court erroneously admitted the firearm recovered on the roof of a store near the bar because the prosecution failed to present evidence connecting it to Petitioner; (5) the trial court improperly imposed consecutive sentences; and (6) the sentence was excessive and should be reduced in the interest of justice.  (SR: 1-62).[7]

On March 5, 2020, the Appellate Division unanimously modified the judgment on the law by directing that Petitioner's sentences must run concurrently rather than consecutively.  *People v. Banks*, 181 A.D.3d 973, 978 (3d Dep't 2020).   While the sentences themselves were not harsh or excessive, *id.* at 977, there was "no proof to show which, if any, of the victims were struck by a bullet that did not first pass through another victim."  *Id.*  Because the prosecution failed to prove "any of the assault convictions arose from a 'separate and distinct' pull of the trigger," the consecutive sentences on those convictions could not stand.  *Id.*  The Appellate Division rejected Petitioner's other claims on the merits and affirmed the judgment as modified.  *Id.* at 974-77.  The New York Court of Appeals denied leave to appeal on June 11, 2020.  *People v. Banks*, 35 N.Y.3d 1025 (2020).

---

[7]     Citations in parentheses to "SR:" refer to the Bates-stamped page numbers in the lower right corner of the state court records, which begin on page 1 of Docket 23-2.

### E.    Collateral Motions

On September 9, 2021, Petitioner filed a motion for a writ of error *coram nobis*, asserting that appellate counsel erroneously failed to argue that trial counsel was ineffective for failing to request a material witness order as to Mack and Rivera and for opening the door to damaging testimony by calling Ellis for the defense.  (SR: 974-98).  On November 26, 2021, the Appellate Division summarily denied the *coram nobis* motion.  *People v. Banks*, 2021 WL 5755508, 2021 N.Y. Slip Op. 75430(U) (3d Dep't 2021); (SR: 999).  On March 31, 2022, the New York Court of Appeals denied leave to appeal.  *People v. Banks*, 38 N.Y.3d 948, 185 N.E.3d 966 (Table) (2022); (SR: 1006).

On June 10, 2022, Petitioner filed a motion pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.47 to be resentenced because of a history of domestic violence.  (SR: 1007-10).  On July 26, 2022, the trial court denied the motion, stating that Petitioner did not provide any support for his claim.  (SR: 1011-12).

### F.    Federal Habeas Proceeding

In his timely petition, Petitioner asserts the following grounds for habeas relief:  trial counsel was ineffective for failing to request a material witness order as to Mack and Rivera, opening the door to damaging testimony by calling Ellis, and failing to object to testimony from certain witnesses that they were reluctant to testify out of fear of retaliation (Dkt. 1 at 4-5) ("Ground One"); the trial court's denial of the missing witness charge as to Mack and Rivera was reversible error (*id.* at 6-7) ("Ground Two"); the evidence was legally insufficient to support the convictions, and the verdicts were against the weight of the

evidence (*id.* at 7-8) ("Ground Three"); and the trial court erroneously admitted the firearm (*id.* at 8-9) ("Ground Four").

Respondent filed an answer (Dkt. 23) and memorandum of law in opposition to the petition (Dkt. 23-1), along with the state court records and transcripts (Dkt. 23-2 through Dkt. 23-13).  Regarding Grounds One, Two, and Four, Respondent raised the defenses of non-exhaustion and procedural default.  (Dkt. 23-1 at 28-32, 40-43).  Respondent also argued that these grounds were not cognizable and meritless.  (*Id.*).  With regard to Ground Three, Respondent argued that it was partially not cognizable and entirely meritless.  (*Id.* at 23-28).  Petitioner did not file a reply.

On July 22, 2024, the Court issued a Decision and Order finding that the petition was a mixed petition containing exhausted and unexhausted claims.  (Dkt. 24).  In particular, the Court found that the ineffective assistance of trial counsel claim asserted in Ground One could not be deemed exhausted and procedurally defaulted because there were still remedies available to Petitioner in the New York State courts.  (*Id.* at 8-9).

The Court determined that Ground Two, based on the trial court's denial of the missing witness charge; and Ground Four, based on the admission of the revolver, were not fairly presented in federal constitutional terms to the New York State courts and were unexhausted.  (*Id.* at 10-11, 14-15).  However, because Petitioner faced an absence of corrective process, both Grounds Two and Four were required to be deemed exhausted and procedurally defaulted.  (*Id.* at 11-12, 15).

As for the weight of the evidence claim in Ground Three, the Court found that it was based solely on New York State law and was not cognizable in this habeas proceeding.

- 25 -

(*Id.* at 13).  Finally, the Court determined that the legal sufficiency claim in Ground Three was fairly presented in federal constitutional terms on direct appeal and was exhausted. (*Id.*).

The Court notified Petitioner that there were two procedural options available—he could proceed on Grounds One, Two, Three, and Four, with the outcome necessarily being a denial of the petition under 28 U.S.C. § 2254(b)(2); or he could delete the unexhausted claim in Ground One and proceed on Grounds Two, Three, and Four.  (*Id.* at 20).  If Petitioner elected the second option, he could attempt to demonstrate cause for, and prejudice resulting from, the default of Grounds Two and Four; or that a fundamental miscarriage of justice will occur if the Court does not hear these claims, i.e., he is actually, factually innocent.  (*Id.*).

Petitioner timely filed his response.  (Dkt. 26).  He has elected to delete the unexhausted ineffectiveness claim in Ground One and proceed on Grounds Two, Three, and Four.  (*Id.* at 8).  Accordingly, the Court dismisses Ground One without prejudice.  The petition, now consisting of Grounds Two, Three, and Four, is no longer a mixed petition.

## III.   <u>STANDARD OF REVIEW</u>

Petitioner's conviction post-dates the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, which "significantly curtailed the power of federal courts to grant the habeas petitions of state prisoners." *Lainfiesta v. Artuz*, 253 F.3d 151, 155 (2d Cir. 2001) (citing *Williams v. Taylor*, 529 U.S. 362, 399 (2000)).  As amended by AEDPA, 28 U.S.C. § 2254(d) "bars relitigation

- 26 -

of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

Under 28 U.S.C. § 2254(d), a federal court "shall not . . . grant[ ]" an application for a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d).  In addition, a state court's factual findings are entitled to a presumption of correctness which only may be rebutted by "clear and convincing evidence." *Id.* § 2254(e)(1).

Even where a habeas petitioner "surmount[s] 2254(d)'s bar to habeas relief," *Wiggins v. Smith*, 539 U.S. 510, 542 (2003), the federal court must review the claim *de novo* under the correct federal standard, *see id*.  In other words, AEDPA "sets forth a precondition to the grant of habeas relief . . . not an entitlement to it." *Fry v. Pliler*, 551 U.S. 112, 119 (2007).  Thus, in addition to satisfying the limitations in § 2254(d), "the petitioner still 'bears the ultimate burden of proving by a preponderance of the evidence that his constitutional rights have been violated.'" *Cardoza v. Rock*, 731 F.3d 169, 178 (2d Cir. 2013) (quoting *Epps v. Poole*, 687 F.3d 46, 50 (2d Cir. 2012)).

IV.   **DISCUSSION**

A.     **Grounds Two and Four**

The Court afforded Petitioner an opportunity to attempt to overcome the procedural default and obtain review of Grounds Two and Four on the merits by showing cause for, and actual prejudice resulting from, the default; or that a fundamental miscarriage of justice will occur in the absence of habeas review.  (Dkt. 24).  In his response (Dkt. 26), Petitioner has included a section labeled, "Cause and Prejudice" (*id.* at 2 (capital letters and underlining omitted)), but he has not attempted to show cause and prejudice or that he qualifies for the fundamental miscarriage of justice exception, i.e., he is actually innocent. (*Id.* at 2-6).  Instead, he reargues the merits of Grounds Two and Four and asks the Court to find that they were fairly presented to the Appellate Division and properly exhausted. (*Id.*).

However, this Court has already determined that Grounds Two and Four were not properly exhausted and has explained its reasoning at length in Docket 24.  The Court afforded Petitioner an opportunity to make the showing required to overcome the procedural default of Grounds Two and Four; it did not invite further argument as to the exhaustion issue.

The Court recognizes that because Petitioner is unrepresented, his pleadings "must be construed liberally and interpreted 'to raise the strongest arguments they *suggest*.'" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (emphasis in original (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006))).  Even construing Petitioner's response (Dkt. 26) liberally as a motion for reconsideration, it falls short.

The Second Circuit's standard for granting reconsideration is "strict."  *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).  Unless the movant shows that the Court "overlooked" information "that might reasonably be expected to alter [its] conclusion," a motion to reconsider "will generally be denied."  *Id.*  The Second Circuit has described "[t]he major grounds justifying reconsideration . . . [as] an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice."  *Virgin Atl. Airways v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citation and quotation omitted).

Petitioner suggests that the Court made a "clear error" in finding that Grounds Two and Four were not fairly presented in federal constitutional terms.  (*See* Dkt. 26 at 3-6).  According to Petitioner, "the Federal nature of the Constitutional claims being advanced were fairly presented to bring State Court to the awareness of their Constitutional magnitude," and "[t]herefore no default actually occurred. . . ."  (*Id.* at 6).

With regarding to the denial of the missing witness jury charge (Ground Two), Petitioner notes that on direct appeal, appellate counsel cited *People v. Savinon*, 100 N.Y.2d 192 (2003) ("*Savinon I*").  (Dkt. 26 at 3 (referring to SR: 41)).  Petitioner acknowledges that *Savinon I* is a case based on New York State law but argues it sufficiently alerted the Appellate Division to the claim's federal nature because the defendant in *Savinon I* eventually filed a 28 U.S.C. § 2254 petition.  (*Id.* (citing *Savinon v. Mazucca*, No. 04 CIV 1589(RMB)(GWG), 2005 WL 2548032 (S.D.N.Y. Oct. 12, 2005), *adopted*, No. 04 CIV. 1589(RMB)(GWG), 2006 WL 2669331 (S.D.N.Y. Sept. 18, 2006), *aff'd*, 318 F. App'x 41 (2d Cir. 2009) ("*Savinon II*"))).

During Savinon's trial, the judge granted a missing witness charge over the defense attorney's objection. *Savinon II*, 2005 WL 2548032, at *13. Savinon argued that he was entitled to habeas relief because his attorney was ineffective in failing to call the witness who was the subject of the jury charge; the habeas court rejected the ineffectiveness claim as meritless. *Id.* at *24-26. In response to Savinon's habeas claim challenging the trial court's grant of the missing witness charge, the respondent argued that this claim was unexhausted because it was not fairly presented in federal constitutional terms in state court. *Id.* at *33. Finding that the missing witness charge was plainly meritless, the habeas court bypassed the exhaustion issue and did not analyze whether Savinon had fulfilled the "fair presentment" requirement. *Id.* at *34. *Savinon II* therefore does not stand for the proposition that a state court's grant or denial of missing witness charge presents a claim of federal constitutional magnitude. So even assuming *arguendo* that Petitioner's citation to *Savinon I* implicitly also cited to *Savinon II*, the latter case provides no support for Petitioner's "fair presentment" argument.

Petitioner also contends that Savinon's counsel's "handling of [the missing witness charge] was significant enough to warrant Federal scrutiny," which was "more than likely what appellate counsel was assuming when he cited this specific case in the brief." (Dkt. 26 at 4). However, the "fair presentment" requirement is not concerned with the petitioner's intent in citing a particular case; rather, it asks whether the petitioner framed the claim so that the appellate court would have been alerted to the claim's federal nature. *See Cox v. Miller*, 296 F.3d 89, 99 (2d Cir. 2002) ("[I]n state court the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature.").

In any event, asserting a claim that a petitioner did not receive effective assistance within the meaning of the Sixth Amendment based on counsel's handling of a missing witness charge exhausts only the ineffectiveness claim, not the predicate for that claim. *See Turner v. Artuz*, 262 F.3d 118, 123-24 (2d Cir. 2001) (finding that the petitioner did not exhaust standalone claims of prosecutorial misconduct by raising them in a *coram nobis* motion as predicates for the claim of ineffectiveness of appellate counsel, on the theory that effective counsel would have appealed on those grounds, because the claims were "distinct . . . in procedural terms under state law and in their federal constitutional sources").

With regard to the claim based on the admission of the firearm (Ground Four), Petitioner notes that appellate counsel cited *People v. Scarola*, 71 N.Y.2d 769 (1988), which in turn cited several federal cases.  (Dkt. 26 at 5-6 (referring to SR: 51 (citing *Scarola*, 71 N.Y.2d at 777))).  According to Petitioner, there "is a high probability that appellant['s] counsel . . . assumed *albeit misguidedly* that citing this case would appraise [sic] the [c]ourt of the Constitutional contention." (*Id.* (emphasis supplied)).  Petitioner thus appears to concede that *Scarola* did not sufficiently alert the Appellate Division that he was raising a due process claim based on the admission of the firearm.

In any event, some of the federal cases that Petitioner claims were mentioned by *Scarola* were not cited by the Court of Appeals in its opinion.  Rather, they were cited by the appellant's counsel in the "Points of Counsel" section.  *See* 71 N.Y.2d at 770-71.  And though the opinion in *Scarola* did cite several Supreme Court and lower federal court cases, *see id.* at 776-77, those cases related to the proper characterization of voice exemplar

testimony as testimonial or nontestimonial, as well as the standards for its admission.  *Id.*
at 776 ("[T]he prosecution can require, for example, that a defendant speak in a station
house lineup to aid the witnesses identification (*United States v*[.] *Wade*, 388 U[.]S[.] 218,
222 [(1967),]) or provide a voice exemplar to a Grand Jury (*United States v*[.] *Dionisio*,
410 U[.]S[.] 1, 7 [(1973)].").  The issues in *Scarola* pertaining to voice exemplar testimony
had no relevance to Petitioner's evidentiary claim on direct appeal.

Most importantly, appellate counsel did not cite *Scarola* for a point of federal
constitutional law.  Instead, he included it as the last case in a string-cite for the propositions
that "[a]ll relevant evidence is admissible, unless its admission violates some exclusionary
rule[,]" and that "[e]vidence is relevant if it has any tendency in reason to prove any
material fact."  (SR: 51).  The Court of Appeals in *Scarola* expressly stated these two
propositions constituted "the general rule" "[i]n New York" regarding the admissibility of
evidence.  71 N.Y.2d at 777.  Appellate counsel's citation to *Scarola* for a proposition of
state evidentiary law did not fairly apprise the Appellate Division that Petitioner was
asserting a due process violation based on the admission of the firearm.  This conclusion
is bolstered by the fact that, as this Court noted in its previous Decision and Order (Dkt.
24), appellate counsel expressly characterized the trial court's error in admitting the firearm
as "non-constitutional error."  (SR: 54).

Petitioner has not demonstrated that the Court made a "clear error" in finding that
Grounds Two and Four were not fairly presented in federal constitutional terms on direct
appeal.  Nor has he attempted to show that there has been an intervening change of
controlling law, that new evidence has become available, or that there is a need to prevent

a manifest injustice.  Because Petitioner has not satisfied the strict standard for granting reconsideration, the Court adheres to its ruling that Grounds Two and Four are unexhausted and procedurally defaulted.

Because Petitioner has not attempted to show cause and prejudice, or that he is actually innocent, the Court dismisses Grounds Two and Four as subject to an unexcused procedural default.

### B.      Ground Three

#### 1.      Weight of the Evidence Claim

As discussed in the Court's previous Decision and Order (Dkt. 24), the claim in Ground Three that the verdict was against the weight of the credible evidence "does not present a cognizable constitutional issue. . . ." (*Id.* at 13).  The Second Circuit has recognized that "the argument that a verdict is against the weight of the evidence states a claim under state law." *McKinnon v. Sup't, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011).  As the Supreme Court has held many times, federal habeas corpus relief does not lie for errors of state law. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Accordingly, district courts in the Second Circuit consistently have dismissed, as not cognizable, claims by habeas petitioners asserting their verdicts were against the weight of the evidence. *McKinnon*, 422 F. App'x at 75 (collecting cases).  Because the challenge to the weight of the evidence asserted in Ground Three does not present anything more than an issue of state statutory law, it is dismissed as not cognizable. *Id.*

- 33 -

2.      **Legal Sufficiency Claim**

The Due Process Clause of the Fourteenth Amendment prohibits a criminal conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime." *In re Winship*, 397 U.S. 358, 364 (1970).  As the Supreme Court has interpreted *Winship*, evidence is legally sufficient to satisfy due process if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

The Appellate Division observed that Petitioner's legal sufficiency claim:

> focuses upon the proof that he was the shooter, which the People attempted to establish through the testimony of multiple individuals who were present at the time of the shooting.  The eyewitnesses agreed that the shooter was a black man standing near the front door of the bar and, for the most part, described him as wearing a dark shirt and a red hat.  Not all of the eyewitnesses could identify that man, but the three eyewitnesses who could either knew defendant [i.e., Payne and Wood,] or had seen him earlier in the evening [i.e., Dowdle,] and named him as the shooter.  The People also elicited testimony that defendant stopped checking in with his bail bondsman and fled the state immediately after the shooting, which suggested consciousness of guilt and was "circumstantial corroborating evidence of identity."

*Banks*, 181 A.D.3d at 974-75 (footnote, quotation, and citations omitted).  The Appellate Division held that "[v]iewing the foregoing proof in the light most favorable to the People," there was "a valid line of reasoning and permissible inferences from which a rational juror could find that defendant was the shooter."  *Id.* at 975.[8]

_____

[8]      Although the Appellate Division did not cite *Jackson*, it applied the same standard of review articulated by the Supreme Court in *Jackson*.  Indeed, the New York Court of Appeals explicitly has acknowledged that "[t]he standard for reviewing the legal

Because the Appellate Division adjudicated the legal sufficiency claim on the merits for purposes of 28 U.S.C. § 2254(d), this Court, sitting in habeas review, must apply a layer of deference in addition to that imposed by *Jackson* itself.  *Coleman v. Johnson*, 566 U.S. 650, 651 (2012).   Mere disagreement with the Appellate Division's decision is not sufficient to justify habeas relief.  *Id.* (citing *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)). Instead, the Court must find that the Appellate Division's decision reflects an "objectively unreasonable," 28 U.S.C. § 2254(d)(1), application of *Jackson.  See Cavazos*, 565 U.S. at 2.

A legal sufficiency analysis begins with identifying the substantive elements of the underlying crime, *see Jackson*, 443 U.S. at 324 n.16, and a necessary element of any crime is identity, *see* N.Y. Crim. Proc. Law § 70.20 ("No conviction of an offense by verdict is valid unless based upon trial evidence which is legally sufficient and which establishes beyond a reasonable doubt every element of such offense and the [d]efendant's commission thereof.").

As the Appellate Division noted, Petitioner argues that the prosecution failed to prove beyond a reasonable doubt that he is the person who committed the charged offenses. Petitioner's specific contentions (*see* SR: 30-37) are uniformly directed to questions of whether to credit witnesses, what weight to give particular testimony and evidence, and how to resolve conflicting evidentiary inferences.  For instance, Petitioner points out that

---

sufficiency of evidence in a criminal case is" the same standard articulated in *Jackson*. *People v. Contes*, 60 N.Y.2d 620, 621 (1983).

McLaughlin and Payne both testified that they saw him at the bar wearing a black or dark-colored shirt and red hat, while Gilboy said Petitioner wore a dark hoodie.  (SR: 34-35).  Petitioner states that "[g]iven the testimony of McLaughlin and Payne, it does seem likely that [he] was wearing a dark shirt and red hat," which "suggests that[] if Gilboy's testimony . . . is credited, the shooter could not have been [Petitioner]."  (SR: 35).  Petitioner also calls into question the reliability of the identifications provided by Payne and Dowdle, noting that they both initially did not identify him as the shooter.  (SR: 33-35).

Whether to credit all, part, or none of a witness's testimony and what weight, if any, to give it, are questions "belong[ing] to the fact-finder."  *Moye v. Corcoran*, 668 F. Supp. 2d 523, 539 (W.D.N.Y. 2009) (citing *Garrett v. Perlman*, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006) (finding that the habeas petitioner's argument in support of his legal sufficiency claim—that a witness's testimony was "incredible"—was "not reviewable in habeas proceedings since credibility determinations are the province of the jury" (citing *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) ("[A]ssessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal."))).  It is true that the prosecution's witnesses provided testimony that "supports conflicting inferences," but the Court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (quoting *Jackson*, 443 U.S. at 319).  Indeed, even Petitioner concedes that Payne and Dowdle both provided explanations for their delays in identifying him—fear of

retaliation—that the jury could have relied on to explain the contradictions between their initial and later statements.  (*See* SR: 33-35).

As is often the case, "the jury's decision was largely a matter of choosing whether to believe [Petitioner's] version of the events or to believe the version offered by the State." *Gruttola v. Hammock*, 639 F.2d 922, 928 (2d Cir. 1981).  Here, the jury chose to believe the prosecution's witnesses and resolved any inconsistencies in their testimony against the defense.  On the basis of the facts adduced at trial, a rational jury could infer that Petitioner, wearing a red hat and a dark-colored or black shirt, fired the shots at Patrick's Bar that wounded Mack, Rivera, Ewanyk, Walker, and Whitmer.  "[T]he only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman*, 566 U.S. at 656.  The Appellate Division answered this question in the negative, "and that determination in turn is entitled to considerable deference under AEDPA, 28 U.S.C. § 2254(d)." *Id.*  Because Petitioner has not shown that the Appellate Division's rejection of his legal insufficiency claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Harrington*, 562 U.S. at 103, he is not entitled to habeas relief.

**V.**     **CONCLUSION**

For the reasons above, the request for a writ of habeas corpus is denied, and the petition (Dkt. 1) is dismissed.  Because Petitioner has not fulfilled the applicable criteria, *see* 28 U.S.C. § 2253(c)(1), (2), a certificate of appealability is denied.  The Clerk of Court is directed to close this case.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:          September 16, 2024
                Rochester, New York